IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 1, 2017

## IN RE DA'VANTE M., ET AL.

Appeal from the Juvenile Court for Jackson County
No. 2016-JV-70     Tiffany Gentry Gipson, Judge

_____

No. M2017-00989-COA-R3-PT

_____

This appeal concerns termination of a father's parental rights. The Tennessee Department of Children's Services ("DCS") filed a petition in the Juvenile Court for Jackson County ("the Juvenile Court") seeking to terminate the parental rights of Craig M. ("Father") to his three minor children Da'Vante, Brandon, and Leaddra ("the Children").[1] After a trial, the Juvenile Court entered an order terminating Father's parental rights on the grounds of failure to provide a suitable home, substantial noncompliance with the permanency plans, and persistent conditions.[2] The Juvenile Court also found that termination of Father's parental rights is in the Children's best interest. Father appeals to this Court. We affirm the judgment of the Juvenile Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed;
Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which ANDY D. BENNETT and KENNY W. ARMSTRONG, JJ., joined.

James M. Judkins, Smithville, Tennessee, for the appellant, Craig M.

Herbert H. Slatery, III, Attorney General and Reporter, and Jordan K. Crews, Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

Sheila L. O'Regan, Guardian Ad Litem.[3]

---

[1] Da'Vante was born in 2001, Brandon in 2002, and Leaddra in 2003.
[2] The Juvenile Court terminated mother Amanda D. ("Mother")'s parental rights to the Children, as well. Mother did not appeal the termination of her parental rights.
[3] The Guardian Ad Litem filed a brief joining in and agreeing with DCS's argument on appeal regarding termination of Father's parental rights.

# OPINION

## Background

In 2013, allegations arose concerning sexual abuse of Leaddra by her maternal grandfather, Charles C. ("Grandfather"). At a court hearing in Warren County, Father agreed to protect the Children from Grandfather. Despite Father's agreement, DCS received a referral in July 2015 alleging that Grandfather was living with Father and the Children. DCS explained to Father that he must keep Grandfather away from the Children. Not long thereafter, a Tennessee State Trooper stopped to help a vehicle with a flat tire. The vehicle contained Father, the Children, Grandfather, and a convicted sex offender. The Children were removed from Father's home and entered state custody on July 17, 2015.

In December 2015, the Juvenile Court adjudicated the Children dependent and neglected. Permanency plans were developed for Father. Among other things, the permanency plans required Father to obtain suitable housing and follow mental health recommendations. DCS planned specialized training for Father. These efforts stopped when Father failed to sign a release. In December 2015 and March 2016, Father completed psychological and parenting assessments. The first assessment stated, in part: "[Father] lacks understanding of his current treatment regimen and the test results indicate he has poor insight into his own thought processes and behaviors." The second assessment stated that Father would require specialized training in order to successfully be reunited with the Children. Father never completed the recommendations of the assessments. Father worked at Hardees and Sonic, earning $7.75 per hour at both jobs. As of trial, Father had not visited the Children since June 2016. Father had lived in a trailer in Jackson County until March 2016. Father then moved in with friends in McMinnville.

The Children initially were placed in the same foster home. However, Leaddra subsequently was placed in a different home because she needed special treatment. In September 2016, DCS filed a petition seeking to terminate Father's parental rights to the Children. This case was tried in February 2017.

Amanda Snedaker ("Snedaker"), a family service worker who worked on the Children's case, testified as follows:

Q. Did [Father], you provided reasonable efforts, you just testified to, did [Father] provide reasonable efforts to establish a suitable home during the time period of July 18th, 2015, to November 18th, 2015?

A. During that time, the physical home environment that he was in was suitable; however, at that point, at the point of the children's removal, it was not suitable in the sense that [Grandfather] was residing with him at the time of the removal. And then, there were psychological evaluations and things that needed to be completed during that time to ensure that the safety of the children would be maintained if they were returned to his care.

Q. Now, who is [Grandfather]?

A. [Grandfather] is the children's maternal grandfather, [Mother's] father.

Q. And why was he an issue to return the children with him being in the home?

A. The initial referral came into the Child Safety Office, stating that [Grandfather] was residing in the home with [Father] and the children. And back in 2013, there had been substantiated report in Warren County of sexual abuse by [Grandfather] against Leaddra [M.].

Q. And that would not be a safe environment --

A. Correct.

Q. -- to return those four children? Excuse me, those three children?

A. Correct.

Q. And why was it necessary for [Father] to complete a psychology assessment and recommendations?

A. It was necessary in that CPSI Ramsey, as well as other staff at DCS, had indicated to [Father] that [Grandfather] could not be around the children. That there would be an additional restraining order filed and that he was not permitted to be near the children. That was reiterated several times. Late, the evening of a child and family team meeting, where that was reiterated, they were, [Father] was in White County, there was a tire blow out in the vehicle that they were in, and when a Tennessee State Trooper pulled over or pulled over to assist them, it was found that [Father], [Grandfather] and the three children, as well as another convicted sex offender were in the vehicle.

Q. So, was there reason to believe that he wasn't understanding the need to protect the children or --

A. That's correct.

***

Q. What were the conditions that led to the removal of the children from the home? And if you aren't familiar, I can ask Pam Ramsey, since she was the worker. But if you are familiar and have personal knowledge of it --

-3-

A. The children were removed from the home, because they were exposed to a known, to a, an individual who had previously substantiated charges of sex abuse of the, against one of the children.

Q. And what are the conditions today that prevent the children from being returned to [Father's] home?

A. [Father], at this point, does not have suitable housing for the children and has not completed the steps of the permanency plan.

On cross-examination, Snedaker testified:

Q. Okay. On subsection C, you swore under oath, that you, he reviewed the criteria and procedure for termination of parental rights. You've reviewed that with him; is that correct?

A. That was done at the initial permanency plan meeting, and his former attorney, Mr. Hoeppner, was actually there for that as well.

Q. Okay. Were you, were you there?

A. Yes.

Q. My question is, how does that help him get a home, reviewing the criteria for termination of parental rights?

A. How does the criteria help him --

Q. Yeah.

A. -- get a home?

Q. Yeah, basically y'all are stating that he failed to establish a suitable home in the first four months. I'm wanting to know how review criteria for TPR relates to that.

A. Well, I would say that it makes him aware of the need to have a suitable home. That criteria is something that gets reviewed with all of the parents who have children in DCS custody. And it goes over the reasons that rights could potentially be terminated. And not having a suitable home falls under, something that was listed in the permanency plan. And noncompliance with the permanency plan is in the criteria.

Q. Okay. But you testified earlier that he's a man who has trouble, basically remembering things or keeping, keeping track of tasks; is that correct?

A. In my experience, yes.

Q. Okay. Okay. You've got, you've got offering and providing the parent transportation, confirming that he has reliable transportation. You've got that listed twice, but -- all right. How many times did you contact him to reschedule mental health appointments?

A. Mental health appointments or appointments through Scott Herman?

Q. Well, through Scott Herman and through any offender training.

-4-

A. The initial appointment, he attended his intake on October 27th. That appointment he did make. I had to reschedule the November appointment for the psychological assessment. I spoke with him about that. And that was rescheduled for the three December dates. Then, he was informed by myself as well as Centerstone, at that time, there was a worker through Centerstone who was working with [Father] and the family, who spoke with him about that January 7th parenting assessment. I was in the home on January the 5th, prior to, two days prior to that appointment and we had discussed that appointment. And then, I had to reschedule that appointment for the March 17th date, because he, the time frame, I guess [Father] got the timing wrong of that appointment on the 7th. He indicated that he thought it was scheduled for eleven o'clock and it had been scheduled for eight o'clock. So, but he did make that appointment on March 17th.

Q. All right. So, he was able to do that for himself? To make, to schedule the appointment for himself?

A. Well, he was able to attend the appointment that was, was scheduled.

Q. Okay.

A. I actually did the scheduling of the appointment with the Mr. Herman's office.

Q. Okay. There were a couple of things that Mr. Herman suggested that I haven't heard much on, and I'll ask them to you. Mr. Herman suggested that he receive specialized training and offender training. Tell me how you went about setting that up.

A. Well, those dates that were scheduled in December that ended up needing to be utilized for assessment times were appointment times that had been scheduled for that non-offender training. When I spoke with Mr. Herman subsequent to the completion of all of [Father's] evaluations, those being the psychologicals in December, as well as the parenting assessment in March, when I came back and resumed working with the family and on the case in April, I had contacted Mr. Herman and at, he indicated to me when I contacted him that due to scheduling, he wouldn't be able to do the non-offender training for [Father] and that I should look for another provider to do that. I did reach out to other providers in Cookeville. I wasn't able to obtain another provider in Cookeville, and at that point [Father] had relocated to McMinnville, which is when I reached out to the provider at Cheer to try to find out if they could provide that service to him.

Another key witness at trial was Father himself. Father testified regarding his efforts in the case as follows, in part:

Q. All right. All right. Let's talk about, once DCS got involved in your life, what did, you know, they have asked you to do a lot of things, have they not?

A. (Nodded head affirmatively.)

Q. Okay. Could you, tell us why you haven't been able to do those things.

A. Well, because of some of the financial situations that I've had in the past.

Q. Okay. Let, let's fast forward to the, before the, before they filed their petition. Did you stay in contact with Ms. Snedaker?

A. I tried to as much as possible, yes, sir. I tried to as much as possible. But due to some complications, my minutes on my phones were limited. I did still have unlimited texting. I tried when I could.

Q. Okay.

A. Everything, like I said, you know, I was working a lot and I had more on me than I could handle, because I was trying to work and trying to do what they was trying to do at the same time. And I just feel like I was, had a build up on me, you know. But I was still trying to do what I was trying to do. Trying to work and trying to do what they tried to tell me to do all at the same time, you know.

Q. Could, could you do it? I mean, did they help you -- do you feel like they helped you?

A. I feel like the help was limited, because DCS in McMinnville, Carolyn made me understand a lot more things, and help with more provider services than they did down here. The services down here was limited, but they didn't do exactly what they was supposed to, is the way that I feel about the situation. Now, they said --

Q. You state you felt like you got good services in McMinnville?

A. I feel, yes, I did, because when it comes to a point that I was down, and I explained to the DCS services about the financial situation that we were in, they recommend other services like places that could have helped me out.

***

Q. You love, do you love your children?

A. I love them dearly and I --

Q. Do you want them?

A. Yes, I do. I really do. And I'm trying to do everything I can possibly -- but a lot of this reflect has to do, like I said, with the deal of the family of how the things -- but when it all boils down to it, I know a lot of this has a reflection on me, but just like how these people have watched these unsolved mysteries on TV and stuff like that, there's a lot of unsolved

stories and things as far as about that ain't nobody really heard what I had to say about the situation of what they have really put me through. But when it all reflects, the only thing they, that y'all see right now is a lot of this stuff is reflecting on me, because I am the father, you know. That I'm not the one that put them in this type of predicament. I'm not the one that actually, you know, mean, you know? I'm not saying that I doubt my daughter, what she said, because, you know, I did question him about the situation and me and him talked about the situation and as a parent, I was very concerned about the situation. But, you know, there was another incident about this situation, too, back in 2013, about the uncle. What I don't understand, wasn't brought to attention in this meeting today, it was a 48-hour restraining order. The same thing that she went through, when she was sent to Nashville and she was examined, but they said she hadn't been touched.

Q. Has Leaddra lied before?

A. She has a few times, but a lot of times, you got to get the understanding of Leaddra, because, I've got a different relationship with Leaddra. Not just because she's my daughter, but the fact of, I've sit and caught her a few times about things of -- Leaddra has a way of going about things, trying to get attention in different ways than the boys, you know. I've caught her at times, said that the boys had done something. I'd be sitting right in the hallway, watching her and they hadn't really done it. She does things to intimidate them at times, to try to get things stirred up. And then try to get them in trouble. And me, you know, like I said, me and her mother, our situation and our, the way we went about things was totally different, you know . . . .

On cross-examination, Father testified:

Q. Okay. Do you believe your youngest daughter was sexually abused?

A. I'm not saying that she's lying about it. I stand by my daughter fully, a hundred percent. I really do. I'm not saying that she's not lying about the situation, but what I don't understand is why that they didn't go into further investigation or they either convicted him over this matter. Then they closed the case.

Q. Do you believe in your child's --

A. I'm not, I'm not saying that. I'm not calling my child a liar. I'm saying, yeah, I do. I do. I do.

Q. So, is that a yes or a no?

A. It's a yes.

Q. Okay. Then my last question is, how long should the children linger in foster care for you to find suitable housing and establish the means to support your children? Another two years?
A. No.
Q. I'm asking for your honest opinion. How long should these children wait on you, today? How long? How is it fair? What's your answer, months, weeks? What's your answer?

*** 

THE WITNESS: I could do it as soon as possible. Like I said, I need, you know, the thing about it, it ain't the part about not putting up the money. The thing about it is finding a suitable place that I can afford and be accommodated and comfortable with paying and still being able to manage, as far as about paying my bills and stuff or what I need to do. That ain't, that ain't the problem. The problem is --
BY MS. KREBS:
Q. So, what is your answer? A month, a week, another year? What is your answer?
A. No, not another week. Maybe, probably a few weeks, I could have a place.

In March 2017, the Juvenile Court entered its final judgment terminating Father's parental rights to the Children on the grounds of failure to provide a suitable home, substantial noncompliance with the permanency plans, and persistent conditions, all by clear and convincing evidence. The Juvenile Court also found termination of Father's parental rights to be in the Children's best interest. The Juvenile Court made an express determination in its order that it found the state's witnesses credible. The Juvenile Court found and held, in part, as follows:

15. The children were removed from the custody of [Father] as the result of a Petition filed in Juvenile Court in which the children were found to be dependent and neglected as defined by Tenn. Code Ann. § 37-1-102(12) and the children were placed in the Department's custody.

16. The Juvenile Court found that the Department made reasonable efforts to prevent removal of the children or the circumstances of the children's situation prevented reasonable efforts from being made prior to the children's removal.

17. The Department has provided the following reasonable efforts to [Father] in the first four months following removal of the children, by providing the following:

a. Providing to the parent directions to the DCS office.

b. Determining if the parent has insurance or TNCARE coverage for medical, mental health and A&D treatment.

c. Reviewing Criteria and Procedure for Termination of Parental Rights with the parent.

d. Confirming parent's employment and income as set out in IV A below.

e. Scheduling visitation between the parent and child and making sure the parent knows the time, date and place of the visitation.

f. Reminding the parent about the visitation by phone, text, e-mail, or in person.

g. Offering and providing transportation to the parent to the visitation or confirming parent has reliable transportation to the visitation.

h. Rescheduling missed or cancelled visitation and arranging for supervision for the visitation.

i. Encouraging the parent to take advantage of every opportunity to visit the child and to utilize the full time allotted for visitation.

j. Arranging a regular day and time for telephone visitation between the parent and child.

k. Gathering records on the parent such as mental health, medical records, assisting the parent in scheduling a mental health intake mental health assessment, psychological evaluation appointment by and by giving the parent a list of local mental health providers with addresses and telephone numbers so parent may select a provider and by calling the providers with the parent present so the parent can also speak to the provider to arrange admission or if the parent does not want CM to call the provider and confirming the parent had access to a telephone to call for an appointment.

1. Offering and providing the parent transportation and confirming parent has reliable transportation to mental health appointments.

m. Obtaining a release from the parents so that the parent's previous mental health records and other documentation of parent's mental health issues can be provided to mental health provider.

n. Obtaining a release from the parent so the mental health providers may communicate with DCS and provide parent's records to DCS.

o. Providing mental health provider the parent's previous mental health records and with other documentation of parent's mental health issues.

p. Calling to confirm whether or not parent attended mental health appointment.

q. Contacting parent to reschedule mental health appointment and to resolve the barriers that prevented the parent from attending the previous appointment.

r. Attempting to review the results from the mental health assessment and psychological evaluation with the parent by scheduling CFTM.

s. Directly contacting the parent in person or by phone. Sending the parent by text messages, e-mails, letters, notices, reports and court documents.

t. Leaving business card and note on parent's residential door or leaving voice mail asking parent to contact DCS.

u. Leaving messages with relatives, employers, probation officer asking them to ask the parent to contact DCS.

v. Obtaining a copy of the child's birth certificate.

w. Confirming parent's employment and income by requesting and receiving from the parent copies of the parent's paycheck stubs on a weekly or monthly basis.

x. Gathering information on the parent's educational, vocational training and work history in order to assist the parent in determining what kind of jobs the parent is qualified to do.

y. Attempting and making visits to the parent's home.

z. Completing walk-throughs of the parent's home.

aa. Calling to confirm whether or not parent attended parenting assessment and parenting education.

bb. Requesting funding obtaining funding and arranging a parenting assessment for the parent, and reviewing the results of the parenting assessment with the parent.

cc. Requesting funding, obtaining funding and arranging in-home parenting education for the parent.

18. For a period of four (4) months following the removal of the children, the Department has made reasonable efforts to assist [Father] in establishing a suitable home for the children, but [Father] has made no reasonable efforts to provide a suitable home and has demonstrated a lack of concern for the children to such a degree that it appears unlikely that he will be able to provide a suitable home for the children at an early date.

19. That four month period of time following the removal is from July 17, 2015, to November 17, 2015. During the first four months, [Father] failed to obtain appropriate housing for his children, and failed to complete a psychological and parenting assessment.

20. Therefore, the Court finds avers [Father] has abandoned the children pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(ii) and therefore his parental rights should be terminated.

21. [Mother] and [Father] have not substantially complied with the provisions of the permanency plans and therefore their parental rights should be terminated pursuant to Tenn. Code Ann. § 36-1-113(g)(2).

22. The initial permanency plan dated August 4, 2015, has a goal of return to parent and requires them to:

a. [Mother] shall satisfy her legal commitments and abide by the rules of probation when she is released.

b. [Mother] and [Father] shall complete a psychological assessment and follow all recommendations.

c. [Mother] and [Father] shall submit to all urine drug screens, hair follicle and pill counts, and test negative.

d. [Father] shall establish a stable means of support, by either employment or public assistance, and provide proof of such to the Department.

e. [Father] shall ensure the safety of the children at all times, including not allowing their maternal grandfather to interact with them.

f. [Father] shall participate in non-offending parent training in order to effectively support the child, Leaddra.

g. [Father] shall complete authorizations with his current mental health provider so that DCS can review previous and current mental health treatment records.

h. [Father] shall submit to a parenting assessment and complete all recommendations from the assessment.

23. The Court ratified the initial permanency plan on December 1, 2015, and found that the plan was reasonable, necessary and in the best interest of the children.

24. The revised permanency plan dated July 5, 2016, has goals of return to parent and adoption and requires them to:

a. [Mother] shall complete a psychological assessment and complete all recommendations from the assessment.

b. [Mother] shall satisfy her legal commitments and abide by the rules of probation when she is released. She shall not incur additional legal charges.

c. [Mother] and [Father] shall submit to all urine drug screens, hair follicle and pill counts, and test negative.

d. [Father] shall ensure the safety of the children at all times, including not allowing their maternal grandfather to interact with them.

e. [Father] shall participate in non-offending parent training in order to effectively support the child, Leaddra.

f. [Father] shall submit to a psychological and parenting assessment. He shall cooperate with provider honestly regarding his current status and complete authorization for release of information so that results and recommendations can be provided to the Department.

g. [Father] shall complete authorizations with his current mental health provider so that DCS can review previous and current mental health treatment records.

h. [Father] and [Mother] shall obtain stable housing and provide proof of housing to the Department. They shall allow no one but himself or herself living in the home with the children.

i. [Father] and [Mother] shall submit to random home visits and home studies to verify safety and suitability of the residence.

25. The Court ratified the revised permanency plan on August 9, 2016 and found that the plan was reasonable, necessary and in the best interest of the children.

26. All of the permanency plans clearly identify in writing [Mother] and [Father's] statement of responsibilities as being both the desired outcomes and actions steps listed in the plan.

27. The requirements in the permanency plans are all reasonably related to remedying the conditions that necessitate foster care.

28. The requirements to obtaining safe and appropriate housing and addressing mental health issues as recommended in psychological and parenting assessments are particularly important in reducing the risk of harm to the children so that the children could be safely returned to [Mother] and [Father's] care.

29. [Mother] and [Father] have not completed the requirements in the permanency plans.

30. Therefore, the Court finds that [Mother] and [Father] have not substantially complied with the provisions of the permanency plans and therefore their parental rights should be terminated pursuant to Tenn. Code Ann. § 36-1-113(g)(2).

31. The children have been removed from the custody of [Mother] and [Father] for more than six (6) months.

32. The conditions which led to the removal of the children from the home of [Father] still exist and other conditions exist which in all probability would cause the children to be subject to further abuse and/or neglect, making it unlikely that the children could be returned to [Father] in the near future.

33. There is little likelihood that these conditions will be remedied at an early date so that the children can be returned to [Father] in the near future.

34. The continuation of the parent and child relationship greatly diminishes the children's chance of an early integration into a stable and permanent home.

35. The conditions that led to the removal of the children from the home of [Father] were substantiated allegations of sexual abuse. The conditions that prevent the children's return to [Father's] home are that he is currently homeless and that he has failed to complete the recommendations in his psychological and parenting assessments.

36. Therefore, the Court finds that the parental rights of [Father] should be terminated pursuant to Tenn. Code Ann. § 36-1-113(g)(3).

\*\*\*

The Court further finds that the State of Tennessee, Department of Children's Services has proven by clear and convincing evidence that termination of parental rights is in the best interest of the child based upon the following findings of fact:

1. [Mother] and [Father] have not made an adjustment of circumstances, conduct or conditions as to make it safe and in the children's best interest to be in the home of the parents. Tenn. Code Ann. § 36-1-113(i)(1) requires the court to consider this factor in determining whether termination of parental rights is in the best interest of the children.

2. [Mother] and [Father] have failed to effect a lasting adjustment after reasonable efforts by available social agencies for such duration of time that lasting adjustment does not reasonably appear possible. Mother has failed to provide proof to the Department that she has completed a psychological assessment. Father has completed his psychological and parenting assessments but has failed to complete the recommendations from those assessments. Tenn. Code Ann. § 36-1-113(i)(2) requires the court to consider this factor in determining whether termination of parental rights is in the best interest of the children.

3. A change of caretaker and physical environment is likely to have a negative effect on the children's emotional, psychological and/or medical condition. Leaddra has special needs regarding medical and counseling appointments that [Father] has not provided proof of being able to meet since he is homeless. Tenn. Code Ann. § 36-1-113(i)(5) requires the court to consider this factor in determining whether termination of parental rights is in the best interest of the children.

4. The physical environment of [Father's] and [Mother's] home is unhealthy and/or unsafe for the children. Both parents have no housing for their children and such living arrangements are inappropriate and unsafe for the children. Tenn. Code Ann. § 36-1-113(i)(7) requires the court to consider this factor in determining whether termination of parental rights is in the best interest of the children.

5. [Mother] has not paid child support consistently with the child support guidelines promulgated by the Department pursuant to Tenn. Code Ann. § 36-5-101. T.C.A. 36-1-113(i)(9) requires the court to consider this factor in determining whether termination of parental rights is in the best interest of the children.

6. [Mother] has not paid a reasonable portion of the children's substitute physical care and maintenance when financially able to do so. The parents have not provided any (or a significant amount of) food, clothing, diapers, toiletries, school supplies, books, toys, etc. [Father] self-reported in his psychological assessment that he smokes "half a pack" of cigarettes a day, but has provided no monetary support for his children since they have entered custody.

7. [Father] and [Mother] have continued to make lifestyle choices that prevent them from being able to parent the children or to provide a home for the children. Both parents are currently homeless and have failed to obtain suitable housing that is appropriate for their children.

8. That [Father] has not visited with his children since June 2016.

9. That the oldest child, Da'Vante [M.], has expressed a desire to have parental rights terminated so that he can be adopted.

10. That the children's mental health counselor has opined that it is in the children's best interest to establish permanency for the children as soon as possible through adoption.

11. That the children need to be released from the stigma of being foster children.

Father timely appealed to this Court.

**Discussion**

Although not stated exactly as such, Father raises the following issues on appeal: 1) whether the Juvenile Court erred in finding the ground of failure to provide a suitable home; 2) whether the Juvenile Court erred in finding the ground of substantial noncompliance with the permanency plans; 3) whether the Juvenile Court erred in finding the ground of persistent conditions; 4) whether the Juvenile Court erred in finding that it is in the Children's best interest for Father's parental rights to be terminated; and, 5) whether the Juvenile Court erred in terminating Father's parental rights when DCS failed to exert reasonable efforts to assist him. DCS raises its own issue of whether Father's unsigned notice of appeal was jurisdictionally deficient.

We first address DCS's jurisdictional issue. Father failed to sign personally his notice of appeal. DCS argues on appeal that Tenn. Code Ann. § 36-1-124(d), which

-14-

provides that "[a]ny notice of appeal filed in a termination of parental rights action shall be signed by the appellant," requires the party's personal signature for the Court of Appeals to have jurisdiction. Between the date of submission of DCS's brief in this case and the filing of our Opinion and Judgment, our Supreme Court issued an opinion concluding that Tenn. Code Ann. § 36-1-124(d) does not establish a jurisdictional requirement that a party sign personally the notice of appeal in a termination of parental rights case. Our Supreme Court stated: "Because section 36-1-124(d) does not require the appellant to sign 'personally' the notice of appeal and does not distinguish the appellant from his or her attorney, we conclude that the word 'appellant' includes an attorney specifically authorized to file a notice of appeal on the appellant's behalf." *In re Bentley D.*, --- S.W.3d ----, 2017 WL 5623577, at *5 (Tenn. Nov. 22, 2017). In the present case, Father's counsel signed his notice of appeal. That is sufficient in keeping with our Supreme Court's holding and Tenn. Code Ann. § 36-1-124(d). We, therefore, hold that the Notice of Appeal was not jurisdictionally deficient.

We next address the merits of the parental termination. As our Supreme Court has instructed regarding the standard of review in parental termination cases:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[4] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few

---

[4] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

consequences of judicial action are so grave as the severance of natural family ties." *Id*. at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(I)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[5] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[6] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction

---

[5] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[6] Tenn. Code Ann. § 36-1-113(i).

with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered).

Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Our Supreme Court, however, has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26 (footnote omitted). As such, we review each of the grounds for termination.

Three grounds for termination are implicated in this appeal. As pertinent, Tenn. Code Ann. § 36-1-113(g)(1) provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113(g)(1) (Supp. 2016).

Regarding failure to provide a suitable home, Tenn. Code Ann. § 36-1-102 provides:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

***

(ii) The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be

-19-

reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department;

Tenn. Code Ann. § 36-1-102(1)(A)(ii) (Supp. 2016).

Regarding substantial noncompliance with the permanency plan, Tenn. Code Ann. § 36-1-113(g)(2) provides:

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4;

Tenn. Code Ann. § 36-1-113(g)(2) (Supp. 2016).

As to persistence of conditions, Tenn. Code Ann. § 36-1-113(g)(3) provides:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or guardian or guardians, still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

Tenn. Code Ann. § 36-1-113(g)(3) (Supp. 2016).

The first issue of Father's we address is whether the Juvenile Court erred in finding the ground of failure to provide a suitable home. The relevant four month period following removal ran from July 18, 2015, to November 17, 2015. Father argues on appeal that he made reasonable efforts in that period to provide a suitable home for the Children, to wit:

[Father] attended a child and family team meeting on July 21, 2015 and October 2, 2015; he completed release by July 23, 2015; attended a permanency plan meeting on August 4, 2015; attended court on September 1, 2015; visited the children on August 19. 2015, September 4, 2015, September 9, 2015, September 18, 2015, September 23, 2015, October 8, 2015; and completed his intake with Mr. Herman on October 27, 2015.

The Juvenile Court found that during the relevant four month period, Father "failed to obtain appropriate housing for his children, and failed to complete a psychological and parenting assessment." In order to provide a suitable home for the Children, Father needed to provide more than a physically sound structure. Father needed to ensure that he could protect the Children in the home from sexual abuse. By failing to complete the recommendations of his parenting and psychological assessments, Father not only failed to address in the relevant four month period the most glaring barrier rendering his home unsafe for the Children and instead made very little serious effort, if any, even to attempt to address this barrier. On the other hand, DCS's efforts, while not herculean, exceeded Father's efforts. Finally, as of trial, Father lacked stable housing, and could only speculate as to when he could obtain stable housing in the future. We find, as did the Juvenile Court, that the ground of failure to provide a suitable home is established by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding the ground of substantial noncompliance with the permanency plans. Father's argument as to this ground is that Father has a difficult time understanding things and that DCS performed an inadequate job of assisting him in completing the specialized training he needs to safely parent the Children. As relevant, the Juvenile Court found: "The requirements to obtaining safe and appropriate housing and addressing mental health issues as recommended in psychological and parenting assessments are particularly important in reducing the risk of harm to the children so that the children could be safely returned to [Mother] and [Father's] care . . ." and "[Father] [has] not completed the requirements in the permanency plans."

As found by the Trial Court, the two most critical requirements under the permanency plans for Father were appropriate housing and addressing his mental health issues. These requirements were reasonable and related to remedying the conditions leading to the Children's foster care placement. Father, by neglecting to undertake the necessary actions either with respect to housing or his mental health over the course of this case up until trial, demonstrated a substantial lack of compliance with the statement of responsibilities in the permanency plans. We find, as did the Juvenile Court, that the ground of substantial noncompliance with the permanency plans was established by clear and convincing evidence.

-21-

We next address whether the Juvenile Court erred in finding the ground of persistent conditions. The Children were removed from Father's home for a period of at least six months and were adjudicated dependent and neglected. Father argues on this issue simply that there was no proof that Grandfather continued to reside with Father, and therefore, the conditions necessitating removal have been eliminated.

Given the deep-rooted issues Father has contended with as evidenced by the record on appeal, we find that argument unpersuasive. Throughout this case, Father has displayed a concerning inability to grasp the importance that he must protect the Children from sexual abuse. Father never has fully addressed or resolved this inability on his part. Father neither has completed all of the recommendations to address his mental health issues nor has he received the specialized training he needs to parent the Children. Therefore, the conditions that led to the Children's removal still exist, and Father does not appear able or willing to rectify those conditions in the near future. We find, as did the Juvenile Court, that the ground of persistent conditions has been established by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding that it is in the Children's best interest for Father's parental rights to be terminated. Tenn. Code Ann. § 36-1-113(i) provides:

> (i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2016).

We observe initially that Father testified to his love for the Children and his desire to regain custody of them. Beyond that, however, the record reflects that Father is in no position to parent the Children successfully. Father has failed to maintain a meaningful relationship with the Children, or to render them the necessary support. Father lacked suitable housing as of trial even for himself, let alone the Children. Most critically, Father never has comprehensively addressed his failure to protect the Children. Meanwhile, the record reflects that the Children are thriving in foster care. The Children deserve stability and an opportunity to move on from their present limbo. We find by clear and convincing evidence, as did the Juvenile Court, that it is in the Children's best interest for Father's parental rights to be terminated.

The final issue we address is whether the Juvenile Court erred in terminating Father's parental rights when DCS failed to exert reasonable efforts to assist him. Our Supreme Court, however, has held that reasonable efforts by DCS, while a consideration in the best interest analysis, generally are not necessary to prove under grounds for termination. Our Supreme Court stated: "[I]n a termination proceeding, the extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis, but

proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). The ground of failure to provide a suitable home is an exception because that ground specifically incorporates reasonable efforts. Our Supreme Court noted: "[I]f the petitioner in a termination proceeding seeks to rely on the ground of abandonment by failure to provide a suitable home, DCS's reasonable efforts are mentioned specifically in the definition of that ground for termination." *Id*. at 554 n. 31. We already have addressed the ground of failure to provide a suitable home and found DCS's efforts to be reasonable given the circumstances of this case. We, therefore, decline to reverse or otherwise modify the Juvenile Court's judgment on the basis of an alleged lack of reasonable efforts by DCS.

In summary, we find by clear and convincing evidence, as did the Juvenile Court, that the grounds for termination of failure to provide a suitable home, substantial noncompliance with the permanency plans, and persistent conditions have been established by clear and convincing evidence. We find, as did the Juvenile Court, that termination of Father's parental rights is in the Children's best interest. The judgment of the Juvenile Court terminating Father's parental rights to the Children is affirmed.

## Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Craig M., and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE